No. 03-729

IN THE SUPREME COURT OF THE STATE OF MONTANA

2005 MT 115

DAVID G. COLE,

        Plaintiff, Respondent and Cross-Appellant,

  v.

VALLEY ICE GARDEN, L.L.C.,
VALLEY ICE GARDEN MANAGEMENT, L.L.C.,
and WILLIAM MARTEL,

        Defendants and Appellants.

APPEAL FROM:    District Court of the Eighteenth Judicial District,
In and for the County of Gallatin, Cause No. DV 99-444
The Honorable Mike Salvagni, Judge presiding.

COUNSEL OF RECORD:

        For Appellants:

                Richard J. Andriolo, Esq., Andriolo & Refling PLLC, Bozeman, Montana;
Donald C. Robinson, Esq. and Ronald A. Thuesen, Esq., Poore, Roth &
Robinson, P.C., Butte, Montana

        For Respondent:

                Monte D. Beck, Esq., Beck, Richardson & Amsden, PLLC, Bozeman,
Montana

Submitted on Briefs: April 6, 2005

Decided: May 5, 2005

Filed:

_____
                        Clerk
Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1     Valley Ice Garden, L.L.C. and Valley Ice Garden Management, L.L.C. (hereinafter collectively referred to as VIG) and William Martel (Martel) appeal the judgment of the Eighteenth Judicial District Court, Gallatin County, that the termination of Plaintiff David G. Cole (Cole) as the hockey coach for the Bozeman Ice Dogs (the Ice Dogs) was without cause.  We reverse and remand.

¶2     This Court issued its original Opinion in this case on February 9, 2005.  Valley Ice Garden filed a Petition for Rehearing on February 24, 2005.  Cole filed his Objections to the Petition for Rehearing on March 9, 2005.  In its Petition, VIG correctly argued that this Court applied the wrong standard of review in its February 9 decision.  On April 6, 2005, we issued an Order withdrawing our February 9, 2005, Opinion.  We replace it with this superceding Opinion.

¶3     The standard of review this Court applies in appellate cases identifies the level of deference we must accord a district court's decision.  When a district court judge is presented with and resolves conflicting evidence, we review the district court's factual findings to determine whether they are supported by substantial credible evidence and whether they are clearly erroneous.  We typically explain that this deferential standard is warranted because the decision-maker, *i.e*., the district court judge in this example, is present throughout the course of the trial, and is able to analyze first-hand the demeanor and credibility of each witness.  *State v. Spina*, 1999 MT 113, 294 Mont. 367, 982 P.2d 421;

2

*State v. Whiteman*, 2005 MT 15, 325 Mont. 358, 106 P.3d 543 (The trier of fact resolves conflicts in the evidence before it, and this Court will not reevaluate this same evidence on appeal). *See generally* Kelly Kunsch, *Standard of Review (State and Federal): A Primer*, 18 Seattle U. L. Rev. 11, 13-14 (1994).

¶4 Conversely, when we have before us review of a district court's grant or denial of a summary judgment motion, we review *de novo*, meaning "anew." We apply the non-deferential *de novo* standard because of the nature of a summary judgment. A summary judgment is "a judgment granted on a claim about which there is no genuine issue of material fact and upon which the movant is entitled to prevail as a matter of law." *Black's Law Dictionary*, Seventh Edition (1999). In other words, the parties are not arguing over what happened or presenting conflicting evidence; they merely need to know which of them, under the uncontested facts, is entitled to prevail under the applicable law. In such a case, the district court judge need not weigh evidence, choose one disputed fact over another, or assess credibility of the witnesses. He or she must identify the applicable law, apply it to the uncontroverted facts, and determine who wins the case. On appeal, the reviewing court has access to the same facts and can put itself in the same position as the district court judge when reviewing his or her purely legal rulings. If, after a *de novo* review, we determine that a district court's legal conclusion is correct, we will affirm. On the other hand, if we conclude that the district court's legal ruling is incorrect, we will reverse.

¶5 In our original decision, we incorrectly stated that the District Court's determination that VIG's termination of Cole's employment was without cause was a "finding of fact." As

a result, we applied the deferential "clearly erroneous" standard. However, the District Court's determination of this issue was a legal conclusion based on uncontested facts and issued in the form of a summary judgment. As a result, we should have reviewed the court's conclusion *de novo*. In this case, the absence of issues of fact and application of the appropriate standard of review makes all the difference. Our application in this superceding Opinion of the non-deferential standard of review leads us to reverse the District Court's conclusion that Cole's termination from employment was made "without cause."

## ISSUE

¶6     VIG presents five issues on appeal and Cole presents two issues on cross-appeal. We conclude the dispositive issue is whether the District Court erred in concluding that Cole was terminated without cause.

## FACTUAL AND PROCEDURAL BACKGROUND

¶7     In June of 1997, Martel purchased the Ice Dogs, a Junior A, American West Hockey League team. Because of the time in the season that Martel purchased the Ice Dogs, he needed to find a coach immediately. Hence, Martel met with and ultimately hired Cole as the Head Coach and General Manager of the Ice Dogs.

¶8     Martel asked Cole to draw up an employment agreement, which Cole did after consulting an attorney. The applicable portion of this employment agreement stated:

> TERM: That the term of this Agreement shall be five (5) years, commencing on the 1st day of June 1997, and continuing thereafter, uninterrupted, unless employee is terminated for cause. In the event of the termination of employee for other than cause, employee shall receive one (1) full calendar year salary and a bonus equal to that paid to him for the preceding year.

4

¶9    The above-quoted provision of the agreement was subsequently amended in March 1998 to add the following:

> Further, the term of this Agreement shall automatically renew, so as to have five (5) years remaining, each year on the 1st day of June, unless employer notifies employee in writing prior to the 1st day of May of that Year of the non-renewal.

Cole's annual base salary was fixed at $50,000.00.

¶10    The 1997-1998 hockey season was fairly successful, but the following 1998-1999 season was not. The Ice Dogs ended that season with a record of 18 wins, 35 losses, and 7 ties. The Ice Dogs did not qualify for the playoffs, Cole did not receive any performance bonuses, and the game attendance declined to approximately 1,000 fans per game.

¶11    Thereafter, during the off-season and at Cole's suggestion, Martel expended substantial sums of money in an effort to improve the team. In particular, Martel increased his recruitment efforts; entered the Ice Dogs in pre-season tournaments and in games in Canada; and hired a goalie coach and a new trainer. Despite these efforts, the 1999-2000 season again started out poorly, with the Ice Dogs winning one game and losing six.

¶12    On October 3, 1999, Martel terminated Cole due to the Ice Dogs' poor performance. Martel then told Cole that because he had cause to fire him, he felt he was not obligated to provide him severance pay. However, Martel did offer Cole $15,000 in severance pay, which Cole accepted. When Cole arrived to pick up his check, Martel asked him to sign a release from liability form, which Cole declined to sign. Cole then sought the advice of an

attorney, and thereafter requested that Martel provide him with a written statement regarding his reasons for terminating him. Martel complied with Cole's request.

¶13 After receiving Martel's explanation, Cole brought an action for breach of the employment contract and for breach of the implied covenant of good faith and fair dealing. Cole filed a motion for partial summary judgment. VIG also filed a motion for summary judgment. The District Court denied VIG's motion, and it granted Cole's motion as to liability, holding, in part, that Cole was terminated without cause. Subsequently, a bench trial was held as to damages and Cole's bad faith claim.

¶14 Ultimately, the District Court determined that VIG did not violate the covenant of good faith and fair dealing; that the liquidated damages clause in the employment agreement was void because Cole's damages were both certain and ascertainable; that Cole's damages included lost wages and fringe benefits based on a five-year term of employment; and that the evidence concerning Cole's INS Visa status was inadmissable in that it was irrelevant, speculative, and not pled in VIG's Answer to Cole's Complaint. The District Court then calculated Cole's damages, accepting the viability of certain damage claims while rejecting others, and awarded damages to Cole in the sum of $199,193.00.

¶15 VIG now appeals the District Court's judgment, and Cole cross-appeals.

## STANDARD OF REVIEW

¶16   Our standard of review in summary judgment appeals is *de novo*.  We use the same standards used by the trial court:  first, whether issues of material fact exist and, if not, whether the moving party is entitled to judgment as a matter of law.  In cases such as this one, where the parties agree on the facts, we review only the district court's legal conclusion that a party is entitled to judgment as a matter of law.  Rule 56(c), M.R.Civ.P.; *Mesa Communications v. Yellowstone County*, 2002 MT 73, ¶ 11, 309 Mont. 233, ¶ 11, 45 P.3d 37, ¶ 11 (citation omitted).

## DISCUSSION

¶17   Did the District Court err in concluding that Cole was terminated without cause?

¶18   The facts relevant to the question of whether Cole was fired for cause are undisputed. VIG fired Cole from his job for unsatisfactory job performance.  The contract Cole drafted allowed for certain payments to be made to him in the event he was terminated for "other than cause."  "Cause" was not defined in the contract.  The District Court was therefore required to determine whether discharge for an unsatisfactory job performance constituted sufficient "cause" for discharge, so as to relieve VIG of the obligation to pay Cole upon termination of his contract.

¶19   VIG contends it had good cause to terminate Cole, and that the District Court erred in concluding that Cole was discharged without cause.  In this connection, it presents several arguments.  First, VIG argues that under Montana law, if any uncertainty in a contract exists, that uncertainty must be construed against the drafter.  As such, VIG contends that any

7

uncertainty as to the meaning of "cause," as contained in the contract, must be construed against Cole, as he drafted the employment agreement. In addition, VIG maintains that the ordinary meaning of "cause" should apply, and that VIG had several "good or adequate" reasons for terminating Cole's employment.

¶20 VIG likens the present case to one brought under Montana's Wrongful Discharge from Employment Act (the WDEA). While acknowledging that the WDEA does not apply here, VIG argues that since "good cause" is defined in the WDEA, that definition provides this Court with a guideline for "cause" in the present case. Namely, the WDEA defines "good cause" as "reasonable job-related grounds for dismissal based on a failure to satisfactorily perform job duties, disruption of the employer's operation, or other legitimate business reason[s]." Section 39-2-903(5), MCA. VIG maintains that based on this definition, we have before upheld termination for "good cause" on the basis of poor job performance and we should do so here as well.

¶21 As VIG notes, Cole admits he was not terminated for a capricious or false reason; in fact, he concedes his termination was the result of his losing record. Thus, there is no allegation of a pre-textual or otherwise improper motive for the discharge. VIG further maintains that firing a coach for a poor win/loss record is hardly unusual in the sports industry. Indeed, VIG contends that the expectation for Cole to win was evident by the built-in bonuses for winning listed in the employment agreement. VIG argues that it is hypocritical for Cole--who drafted the employment agreement--to claim he should be financially rewarded for winning, yet not penalized for a poor win/loss record.

8

¶22 Cole contends that because the plain language of the employment agreement does not list as one of Cole's duties the need to maintain a specific win/loss ratio, this Court need not analyze the contract any further, as it cannot insert terms into the contract that are not there. Hence, because the win/loss ratio was not delineated in the employment agreement, the fact that Cole was terminated because of it proves that he was not terminated "for cause." He then maintains that "[t]he fundamental issue in this case is not whether VIG had a right to discharge Coach Cole." Rather, he argues that because coaches are commonly terminated for failing to maintain a winning record, it follows that VIG is obligated to pay off the remainder of a coach's contract, as is the case here. Cole further maintains that the WDEA's definitions do not apply to the present case. Finally, he asserts that the employment agreement should not be construed against him because VIG, as the employer, was in the superior bargaining position and took unfair advantage of him.

¶23 Neither the District Court nor the parties identified any issues of material fact as to the issue of Cole's termination. Therefore, we need only determine whether the District Court's conclusion--that Cole's failure to maintain an acceptable win/loss ratio was not just "cause" for terminating his contract--is correct. *Mesa*, ¶ 11.

¶24 "The construction and interpretation of a contract is a question of law for the court to decide." *Schwend v. Schwend*, 1999 MT 194, ¶ 36, 295 Mont. 384, ¶ 36, 983 P.2d 988, ¶ 36 (citing *Stutzman v. Safeco Ins. Co. of America* (1997), 284 Mont. 372, 376, 945 P.2d 32, 34). The law thus imposed on the District Court, and this Court on appeal, the duty of interpreting, as a matter of law, the employment agreement entered by the parties.

9

¶25 The District Court concluded that because "[t]he condition to have a winning percentage or an adequate win/loss record ratio was not in the contract . . . the Plaintiff's termination was without 'cause.'" The District Court noted that the contract included "coaching" as a duty, but, stating there were no Montana cases addressing the termination of a coach's employment for a poor win/loss record, reasoned therefrom that permitting the termination of Cole's employment for this reason would require the insertion of "language into the contract which was not agreed upon by the parties." Thus, according to the District Court, because (1) there are no previous cases on point, and (2) "cause" is not defined by the contract, then (3) poor team performance cannot be "cause" for termination of employment, despite Cole's contractual duty of "coaching."

¶26 Although the District Court may have believed it was avoiding the insertion of language into the contract, what it actually did was substantially eliminate an agreed-to provision of the contract: that Cole was subject to termination for "cause." Cole's failure to define "cause" when drafting the agreement does not mean that the term has no meaning, or that the parties intended the term to have a narrow, specific meaning. Indeed, Cole concedes that coaches are routinely terminated for failing to maintain a winning record, and argues that the question is not whether VIG could fire him, but rather, whether it ought to be required to pay out the term of his contract. See ¶ 30. He acknowledged in the District Court that the "measuring stick" of a team's performance is its record, and that the win/loss record is a "big factor" in assessing a coach's performance. In essence, Cole is not disputing management's right to fire him for poor performance; he simply wants to be paid upon the

10

occurrence of that discharge. He asks that we uphold his compensation not because the discharge was wrongful, but rather because the contract he drafted does not specify it as so.

¶27 The lack of any definition of "cause" in the contract Cole drafted meant that it was incumbent on the District Court to decide what the term means. In doing so, the court must be guided by § 28-3-501, MCA, which provides: "The words of a contract are to be understood in their ordinary and popular sense . . . ." Where the parties' contract fails to define a term, we look to this rule of construction, as well as to the general rule that unclear language in a contract should be construed against the drafter. *See*, § 28-3-206, MCA.

¶28 VIG offers a number of cases we have decided pursuant to the WDEA, which defines "good cause" as "reasonable job-related grounds for dismissal based on a failure to satisfactorily perform job duties . . . or other legitimate business reason." Section 39-2-903(5), MCA. Acknowledging that this is not a WDEA case, we nonetheless find that these cases offer persuasive guidance in this matter.

> It is well settled in our pre-[wrongful discharge] Act cases that courts should not intrude in the day-to-day employment decisions of business owners. . . . An employer's legitimate right to exercise discretion over whom it will employ must be balanced, however, against the employee's equally legitimate right to secure employment. . . . The balance should favor an employee who presents evidence, and not mere speculation or denial, upon which a jury could determine *that the reasons given for his termination were false, arbitrary or capricious, and unrelated to the needs of the business.*

*Morton v. M-W-M, Inc.* (1994), 263 Mont. 245, 250, 868 P.2d 576, 579 (emphasis added) (alteration in original) (citing *Kestell v. Heritage Health Care Corp.* (1993), 259 Mont. 518, 525, 858 P.2d 3, 7-8). We further explained in *Kestell* that we had defined "legitimate

11

business reason" as "a reason that is neither false, whimsical, arbitrary or capricious, and it must have some logical relationship to the needs of the business." *Kestell*, 259 Mont. at 525, 858 P.2d at 7 (quoting *Buck v. Billings Montana Chevrolet, Inc*. (1991), 248 Mont. 276, 281-82, 811 P.2d 537, 540).

¶29 Similar standards have been applied in other jurisdictions for similar situations, including the discharge of a coach employed pursuant to a contract which allowed discharge only for good cause:

> The term "good cause" is "largely relative in [its] connotation, depending upon the particular circumstances of each case." "Essentially, [it] connote[s] 'a fair and honest cause or reason, regulated by good faith on the part of the party exercising the power.' [Citation.]" The employer does not have a right to make an arbitrary or unreasonable decision about terminating an employee when there is an agreement to terminate only for good cause.

*Wood v. Loyola Marymount University* (1990), 218 Cal.App.3d 661, 670, 267 Cal.Rptr. 230, 235 (citations omitted) (alterations in original) (addressing discharge of University's head baseball coach).

¶30 Cole did not establish, nor even assert, that the reasons for terminating his employment "were false, arbitrary or capricious, [or] unrelated to the needs of the business." *Morton*, 263 Mont. at 250, 868 P.2d at 579. Neither did he establish, nor even assert, that VIG's reasons were "false, whimsical . . . [or did not] have some logical relationship to the needs of the business." *Kestell*, 259 Mont. at 525, 858 P.2d at 7. As we have defined the term in both WDEA and non-WDEA cases, VIG had a "legitimate business reason" to terminate Cole, a reason "logically related to the needs of the business." Discharging the

coach of a professional sports team which is performing poorly, despite management's good faith efforts, is a discretionary decision related to the legitimate needs of the business and constitutes "cause."

¶31    Had the District Court concluded on the basis of disputed facts, and after a trial on the merits, that Cole was not discharged for "cause," we would rightly be reluctant to disturb such a finding and conclusion on appeal. This was essentially our holding in the withdrawn opinion. However, applying our *de novo* standard of review to a conclusion of law reached from undisputed facts, we are compelled under the law set forth above to reverse the District Court's conclusion of law that Cole was fired without cause. As a matter of law, VIG had "cause" to discharge Cole. Therefore, Cole is not entitled to recover under the contract.

¶32    Reversed and remanded.

/S/ PATRICIA O. COTTER

We Concur:

/S/ KARLA M. GRAY
/S/ JOHN WARNER
/S/ W. WILLIAM LEAPHART
/S/ JIM RICE
/S/ JAMES C. NELSON

13